# EXHIBIT A:

## *Farmer v. Townsend* ORDER

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

DANNY FARMER,

    Plaintiff,

    v.

CATHERINE TOWNSEND,

    Defendant.

Civil Action No.

2:25-cv-258-RWS

## ORDER

This case comes before the Court on Defendant Catherine Townsend's

Motion to Dismiss for Failure to State a Claim and Lack of Personal Jurisdiction

(the "Motion"). [Dkt. 7]. After reviewing the parties' briefings, the Court enters the

following Order.

## BACKGROUND

### I.    Factual Background

In 1999, a young woman from Gainesville, Georgia named Elaine Nix was

murdered—a crime which remains unsolved to this day. [Dkt. 1 – Compl., ¶¶ 36,

38]. In this case, a Gainesville resident brings a defamation suit against the host of

a true crime podcast based on statements made during a series of podcast episodes about the murder.

### A.   The Nix Episodes

Defendant Catherine Townsend is the creator and host of the true crime podcast *Hell and Gone* (the "Podcast") which discusses unsolved murders across the country. [Id. at ¶¶ 1, 2, 52]. Ms. Townsend personally investigates the murders she covers in her Podcast, which includes interviewing people for source material and submitting FOIA requests for local police investigations. [Id. at ¶¶ 53, 55]. She is also the primary speaker in her Podcast episodes. [Id. at ¶ 67]. The Podcast has a "Murder Line," a phone number which she encourages listeners to call if they have a case for her and her team to investigate. The Murder Line has a 6-7-8 Georgia area code. [Dkt. 1-2 – Exhibit B, Transcript of June Nix Episode, at 3].

Ms. Townsend published two Podcast episodes about the murder of Ms. Nix, one on May 30, 2024 (the "May Nix Episode") and another on June 5, 2024 (the "June Nix Episode") (collectively, the "Nix Episodes"). [Dkt. 1, at ¶ 4]. Ms. Townsend investigated for the Nix Episodes by reaching out to individuals in Gainesville, Georgia, including Ms. Nix's mother, Becky Nix; the Nix's family's friend, Jennifer Boyd; and a woman who received a letter discussed in the Nix Episodes, also named Jennifer Boyd. [Id. at ¶ 55; see generally Dkts. 1-1 – Exhibit

2

A, Transcript of May Nix Episode, Dkt. 1-2]. Ms. Townsend relied upon these interviews as sources for the Nix Episodes, and she quoted and played portions of these interviews in both Nix Episodes. [See generally Dkts. 1-1, 1-2]. She also submitted a FOIA request to the Hall County Sheriff's Office as part of her investigation. [See generally Dkts. 1-1, 1-2].

### B.    The Walters Letter

During the course of her investigation into Ms. Nix's murder, Ms. Townsend came across a letter (the "Walters Letter"), which she read aloud and discussed in the Nix Episodes. The contents of the Walters Letter and Ms. Townsend's statements discussing it form the basis of Plaintiff Danny Farmer's defamation claim.

According to Ms. Townsend's statements in the May Nix Episode, the Walters Letter surfaced a few years after the murder. [Dkt. 1 at ¶ 60; see Dkt. 1-1]. The Letter purports to be written by a man named Jim Walters, who was a prominent figure in the Gainesville community at that time. [Id. at ¶¶ 60(c), 50]. In this Letter, the author claiming to be Mr. Walters "confesses" to murdering Ms. Nix with his friends, one of whom was Plaintiff Farmer. [Id. at ¶¶ 60(c), 60(d)].

Mr. Farmer, one of the men accused of murder in the Letter, is a Hall County resident with no criminal background who owns and operates a grading

3

business in Hall County. [Id. at ¶¶ 39, 41, 42, 45]. Mr. Farmer alleges that the Walters Letter and its account of Ms. Nix's murder is false. [Id. at ¶¶ 5, 89–95]. Mr. Farmer states that he is not a murderer and specifically alleges that he had no involvement in the murder of Ms. Nix, a woman with whom he had never interacted in his life. [Id.].

On her Podcast, Ms. Townsend stated that the Hall County Sheriff's Office determined that the Walters Letter was a hoax because it "did not match the 'physical evidence' of the murder." [Id. at ¶ 60(f)]. Mr. Farmer alleges that Ms. Townsend "knew that law enforcement had determined the [Walters] Letter was a hoax many years before the Nix [Episodes]," and that the Letter had not previously been made public before she read and discussed in on her Podcast. [Id. at ¶ 60(g), (h), 61, 62, 63, 64]. Ms. Townsend read and discussed details from the Walters Letter in her May Nix Episode and June Nix Episode.

**C.    May Nix Episode**

The May Nix Episode is the second episode in a series of three discussing Ms. Nix's murder.[1] [See Dkt. 1-1, at 1]. Ms. Townsend began the May Nix

---

[1] Although Ms. Townsend discusses Ms. Nix's murder over the span of three episodes, Mr. Farmer only alleges that the second and third episode contained defamatory statements towards him.

Episode by discussing details from the police investigations, multiple potential leads law enforcement was following, and the results of Ms. Nix's autopsy report. [Id. at 2–9]. Halfway through the May Nix Episode, Ms. Townsend introduced the Walters Letter:

> There was another letter that we talked about last week. We mentioned it was reported in the Gainesville Times back in December of 2006 that was supposedly written by a local businessman. And in that letter, according to the newspaper, this businessman confessed that he and some other people kidnapped Elaine after offering her money for unknown reasons. Well, that was pretty vague. So we tried to track down that letter and we did get a copy of it. Elaine's mother Becky has had a copy all these years. Now the newspaper said the police apparently determined that this letter was just a red herring. They decided the details of the letter did not match the physical evidence they had. I know we may not have access to the entire case file, but honestly, once I saw this letter, I was blown away because unless I'm missing something, I totally disagree with the police assessment.

[Id. at 9]. She discussed how, in September 2006, the Walters Letter had been placed in the mailbox of Jennifer Boyd, claiming to be written by Mr. Walters, also known as "Big Jim." [Id. at 9–10]. The letter was given to the Hall County police, but Becky Nix supplied to Ms. Townsend a copy of the Letter that she had kept. [Id. at 11]. Ms. Townsend reported that, in interviews with the woman who received the letter, the woman told Ms. Townsend that "the vibe was that the police didn't seem to believe it, and she admits she had a hard time believing it

herself" and that the Letter "made [her] feel like somebody was mad at one of the three men, and, or all three of them, and was just trying to get them in trouble." [Id. at 11–12].

Ms. Townsend then noted that:

[n]ow, I've seen a lot of confession letters over the past six years. I've seen letters that were meant to mislead people, or get people in trouble, or just confess for all kinds of reasons, and it's not possible to say for sure that Big Jim even wrote this letter. It could have been someone trying to frame him. It's totally possible someone was trying to set Big Jim up or was mad at him for some reason or had a grudge.

[Id. at 12].

Ms. Townsend went on to discuss how well-known Big Jim was in the Gainesville community and then said "[s]o while I am taking this letter with a grain of salt, I must say that at least on a first read, it appears to be very believable and sincere. But I'm going to let y'all judge. I'm going to read you a section of the letter." [Id.].

Ms. Townsend proceeded to read and paraphrase the contents of the Walters Letter, which describe how "Big Jim," and his friends, Johnny Lovell and Plaintiff Farmer, were drinking alcohol and smoking marijuana at a trailer near the place where Ms. Nix was initially abducted and began to drive around the area; the men saw Ms. Nix at the gas station where she was abducted; Walters offered her money to "spend some time with [them]," which she declined; Mr. Farmer "really flew off

6

the handle and went after her," and physically assaulted Ms. Nix, suffocated her

until she passed out, pulled her into the back seat of the car, and restrained and

sexually assaulted her; the men realized Ms. Nix was dead and Mr. Farmer got

angry and said that "he would handle the situation." [Id. at 12–13].

Ms. Townsend paused at that point in the letter to tell listeners

> I'm going to stop for a minute and just say, this is so horrifying. As a
> human being, as a woman, I can't imagine anything worse than being
> dead or dying, needing help and having these predators, there's no other
> word for it, treating me like a piece of meat, passing me around in that
> backseat while I'm basically paralyzed. If this is true, they were treating
> her like she was nothing. They had zero regard for her humanity. They
> knew she was in trouble, and instead of trying to help her, they were
> preying on her.

[Id. at 13].

Ms. Townsend then paraphrased the remainder of the Letter: that the men

"threw" Ms. Nix's body into the back of the truck, then took the body to a bin at an

antique supply company; then Mr. Farmer moved the body again several days

later. [Id. at 13–14]. Ms. Townsend went on to read the end of the Walters Letter,

where Jim expresses "remorse and grief" for his "crimes" and states that he wants

to come clean to the community about his part in the murder, and that he also

"thinks that Danny might be targeting another young woman" and that "[t]his

needs to stop." [Id. at 14]. Ms. Townsend told readers "[s]o we need to find out, is

7

this letter real? Was it written by Jim Walters or someone trying to point the finger

at Jim Walters. And if so, why?" [Id.].

She concluded the May Nix Episode with the following statements:

We are still working on other leads, and I just want to say one more time, we have no idea if this letter was actually written by Jim Walters. It looks authentic, but it could be a complete hoax. The police really might have ruled this out years ago. But if that's the case, why is there no mention of it in the case file? We need to find out if these people were ever questioned, and what the story is with this letter. We need to follow this up. And if Danny is still out there somewhere, we need to find him.

[Id. at 15].

Ms. Townsend relied upon her interviews with multiple Gainesville

residents, including Becky Nix and the woman who initially received the Walters

Letter, in the May Nix Episode. [See generally Dkt 1-1].

### D.    June Nix Episode

During the Podcast episode published on June 6, 2025, Ms. Townsend

briefly recapped the details of Ms. Nix's murder, and then told listeners that she

"wanted to update you all on what's going on with this confession letter, the one

that's supposedly written by a local businessman named James A. Walters, a/k/a

Big Jim, and what we're doing to track down the origins of that mysterious letter."

[Dkt. 1-2, at 3]. She stated that "[a]s we said last week, we don't know for sure if

this letter's authentic, and that's a big part of our investigation right now." [Id.].

Ms. Townsend reiterated the contents of the Walters Letter, and then discussed the

details that "check out":

> [f]or one thing, Danny Farmer did own a grading business, just like Big Jim stated in the letter. Secondly, whoever wrote that letter knew Jim Walters' real address because that address was included, and we have verified it is the address that he lived at at the time. The letter also made a reference to Danny liking blonde women. Danny's wife was blonde and petite. She passed away pretty recently. We know that these men did associate with each other at that time. Also, the person who was claiming to be Big Jim said that they all hung out at a trailer that was off Candler Highway, which is the same highway where Zack's was located and where Elaine was using that payphone. The timing seemed to be right. The letter said that the three men approached Elaine after midnight. We know that she was on the phone until just after midnight. That's all in the police report. The person who wrote the letter also mentioned the Kangaroo gas station. He said that they stopped by there afterwards. We confirmed that that gas station was nearby. So some of the details, at least on the surface, do seem to match.

[Id. at 5]. However, Ms. Townsend then told listeners that the similarities "[are]

not proof. All of this is still completely circumstantial . . . [s]o we really need to

figure out if the facts in this letter match the physical evidence that we have so

far." [Id. at 5–6].

Ms. Townsend then mentioned that the Walters Letter does not say what

happened to Ms. Nix's clothes, even though her clothes were missing when her

body was found. [Id. at 6]. Ms. Townsend asked viewers

> [s]o what happened to Elaine's clothes? Did Jim leave that part out from the letter because it might not have been flattering to these guys, or did something happen afterwards? If Jim was telling the truth in that letter, could that have been Danny or someone else who, when they moved the body, were thinking about the possibility of those fibers? Or if he was telling the truth, could Danny or Danny and someone else have moved the body later? And that would be when Elaine's clothes were removed. Maybe they were thinking about the possibility of fibers being on that clothing and they wanted to protect themselves from that, or maybe they were hoping that Elaine's body would not be identified.

[Id. at 6–7]. Ms. Townsend then discussed the significance of Ms. Nix's backpack, which was part of the Hall County police investigation, [id. at 7–8], then returned to the Walters Letter to compare the details in the Letter to details from the autopsy report. [Id. at 9]. Ms. Townsend reported that information in the autopsy report did not indicate strangulation as an obvious cause of death, but that suffocation was a possibility, "although sadly, her body was too decomposed to know for sure." [Id.].

> To conclude her analysis of the Walters Letter, Ms. Townsend noted that:

> the letter writer could not have known how Elaine died from the autopsy report. And yet in the letter, which was supposedly written by Jim Walters, it says specifically, Danny grabbed her at the gas station, put his hand over her face, and so she basically wasn't able to breathe and she died, which would on the surface appear to match the physical evidence. The autopsy report states suffocation was a possibility. Again, there's the fact that they mentioned the trailer off Candler Road, the same Highways Zack's was on, the Kangaroo gas station, the timing.

[Id. at 10]. Ms. Townsend continued by saying "[i]n my opinion as an investigator, both the geography and the personal relationships of the people in the letter would definitely have warranted the police talking to these men." [Id.].

Ms. Townsend went on to discuss other cases of gas station abductions, [id. at 10–12], and she concluded the episode by returning to the Walters Letter, specifically discussing questioning why the Hall County Sheriff's Department did not include the letter in response to Ms. Townsend's FOIA request. [Id. at 12–13].

Ms. Townsend discussed and relied upon her interviews with Becky Nix multiple times in the June Nix Episode. [See id. at 7–8, 12–13].

## II.     Procedural History

Mr. Farmer filed his Complaint on August 23, 2025 [Dkt. 1] asserting a claim for defamation against Ms. Townsend based on statements in the Nix Episodes. Ms. Townsend filed a Motion to Dismiss for Failure to State a Claim and Lack of Personal Jurisdiction on September 23 [Dkt. 7], under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(2) respectively. Mr. Farmer filed his Response in Opposition ("MTD Response") [Dkt. 15] on October 21 alongside a Motion for Discovery Regarding Jurisdiction ("Motion for Discovery") [Dkt. 16]. Ms. Townsend filed her Reply Brief on November 17 ("MTD Reply"). [Dkt. 19].

The Court will discuss Mr. Farmer's Motion for Discovery regarding

Jurisdiction [Dkt. 16], Ms. Townsend's 12(b)(2) motion [Dkt. 7], and her 12(b)(6)

motion [Dkt. 7] in turn.

**DISCUSSION**

## I.   Mr. Farmer's Motion for Discovery Regarding Jurisdiction

As a preliminary matter, the Court will address Mr. Farmer's Motion for

Discovery [Dkt. 16] before discussing whether the Court has personal jurisdiction

over Ms. Townsend. Alongside her Motion, Ms. Townsend attached a signed

declaration refuting some of Mr. Farmer's jurisdictional allegations. [See generally

Dkt. 7-2 – Decl. of Catherine Townsend]. Mr. Farmer filed a Motion for Discovery

"seeking leave to conduct limited jurisdictional discovery if the Court does not

deny Defendant's motion to dismiss." [Dkt. 16, at 1].

Because Ms. Townsend attached a declaration to her motion to dismiss to

refute some of Mr. Farmer's jurisdictional allegations, she mounts a factual, as

opposed to facial, attack against jurisdiction. See In re Zantac (Ranitidine) Prods.

Liab. Litig., 706 F. Supp. 3d 1363, 1366 (S.D. Fla. 2020) (distinguishing between a

facial and factual challenge to personal jurisdiction). However, Ms. Townsend's

declaration refutes only some of the jurisdictional facts alleged in the complaint,

while failing to refute the majority of Mr. Farmer's specific jurisdictional

12

allegations. [See Dkt. 7-2; cf. Dkt. 1, at 4–7; Dkt. 15, at 4]. Therefore, the Court will not require jurisdictional discovery to resolve the question of personal jurisdiction over Ms. Townsend, and the Court will limit its analysis to only the unrefuted jurisdictional allegations in Mr. Farmer's complaint, which are sufficient for the Court to find that it does have personal jurisdiction over Ms. Townsend. See Am. C.L. Union of Fla., Inc. v. City of Sarasota, 859 F.3d 1337, 1341 (11th Cir. 2017) (determining that "parties have a 'qualified right to jurisdictional discovery'" when "facts that go to the merits and the court's jurisdiction are intertwined and genuinely in dispute" (quoting Eaton v. Dorchester Dev., Inc., 692 F.2d 727, 729 n.7 (11th Cir. 1982))); see id. ("In order to justify jurisdictional discovery, the disputed facts must be material to the jurisdictional inquiry.").

Therefore, Mr. Farmer's Motion for Discovery Regarding Jurisdiction [Dkt. 16] is **DENIED**.

## II.   Ms. Townsend's Motion to Dismiss for Lack of Personal Jurisdiction

### A.   12(b)(2) Legal Standard

"Generally, '[a] plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction.'" N. Am. Sugar Indus., Inc. v. Xinjiang Goldwind Sci. & Tech. Co., Ltd., 124 F.4th 1322, 1333

13

(11th Cir. 2025) (alteration in original) (quoting United Techs. Corp. v. Mazer, 556

F.3d 1260, 1274 (11th Cir. 2009)). "But if 'a defendant challenges personal

jurisdiction in a Rule 12(b)(2) motion to dismiss,' Federal Rule of Civil Procedure

12(i) affords the district court 'discretion on how to proceed.'" Id. (quoting

AcryliCon USA, LLC v. Silikal GmbH, 985 F.3d 1350, 1364 (11th Cir. 2021)).

"The district court has two options: (1) hold an evidentiary hearing before trial to

make factual findings about personal jurisdiction or (2) decide the motion to

dismiss 'under a prima facie standard' without an evidentiary hearing." Id.

(quoting AcryliCon, 985 F.3d at 1364–65).

Under the "prima facie standard," "the district court decides the motion to

dismiss based solely on the complaint and affidavits." AcryliCon, 985 F.3d at

1364. "The plaintiff meets its burden if it presents enough evidence to withstand a

motion for judgment as a matter of law." Id. (citing Stubbs v. Wyndham Nassau

Resort & Crystal Palace Casino, 447 F.3d 1357, 1360 (11th Cir. 2006)).

First, "[t]he court accepts as true all *unchallenged facts* in the plaintiff's

complaint." Id. (emphasis added); see also Cable/Home Commc'n Corp. v.

Network Prod., Inc., 902 F.2d 829, 855 (11th Cir. 1990) ("The district court must

accept the facts alleged in the complaint as true, to the extent that they are

uncontroverted by the defendant's affidavits."). Further, a jurisdictional challenge

"should be treated with caution, and denied if the plaintiff alleges sufficient facts in his complaint to support a *reasonable inference* that the defendant can be subjected to jurisdiction within the state." Bracewell v. Nicholson Air Servs., Inc., 680 F.2d 103, 104 (11th Cir. 1982) (emphasis added).

Second, "the defendant challenging jurisdiction may submit 'affidavit evidence in support of its position.'" N. Am. Sugar, 124 F.4th at 1333 (quoting Mazer, 556 F.3d at 1274). "The defendant's affidavit evidence must contain 'specific factual declarations within the affiant's personal knowledge.'" Dvoinik v. Rabl, 2024 WL 4456270, at *2 (11th Cir. Oct. 10, 2024) (quoting Posner v. Essex Ins. Co., 178 F.3d 1209, 1215 (11th Cir. 1999) (finding conclusory affidavit "of little significance")).

Third, if "a defendant submits non-conclusory affidavits to controvert the allegations in the complaint, the burden shifts back to the plaintiff to produce evidence to support jurisdiction." Don't Look Media LLC v. Fly Victor Ltd., 999 F.3d 1284, 1292 (11th Cir. 2021). In other words, "[o]nce the burden has shifted back to the plaintiff, the plaintiff 'is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof,' and may not 'merely reiterate the factual allegations in the complaint.'" Dvoinik,

15

2024 WL 4456270, at *2 (quoting Polski Line Oceaniczne v. Seasafe Transp. A/S, 795 F.2d 968, 972 (11th Cir. 1986)).

"To the extent that 'the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff.'" AcryliCon, 985 F.3d at 1364 (quoting Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc., 593 F.3d 1249, 1257 (11th Cir. 2010)). "Whether the plaintiff satisfied the prima facie requirement is a purely legal question; the district court does not weigh evidence or make credibility determinations." Id. at 1364–65.

### B.   Analysis

"When a federal court sits in diversity, it properly may exercise personal jurisdiction over the defendant 'only if two requirements are met: (1) the state long-arm statute, and (2) the Due Process Clause of the Fourteenth Amendment.'" Glob. Payments Direct, Inc. v. Intelligent Payments, LLC, 2015 WL 13736621, at *1 (N.D. Ga. Mar. 6, 2015) (quoting Posner v. Essex Ins. Co., 178 F.3d 1209, 1214 (11th Cir. 1999)). "First, courts must consider whether the exercise of personal jurisdiction over the defendant would comport with Georgia's long-arm statute." Id. (citing Internet Sols. Corp. v. Marshall, 557 F.3d 1293, 1295 (11th Cir. 2009)). Second, courts must determine whether the defendant has sufficient minimum

16

contacts with the forum state and whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. Internet Sols. Corp., 557 F.3d at 1295–96.

In his complaint, Mr. Farmer argues that personal jurisdiction over New York resident Ms. Townsend is proper pursuant to Georgia's long arm statute and due process due to her contacts with the forum state of Georgia. [Dkt. 1, at ¶¶ 11, 16–35]. Ms. Townsend's declaration addresses some of Mr. Farmer's jurisdictional facts but fails to refute the majority of his specific factual contentions. [See Dkt. 7-2]. The Court looks first to whether jurisdiction over Ms. Townsend is proper under Georgia's long arm statute, and then to whether that jurisdiction comports with due process.

### 1.  Georgia's Long Arm Statute

Georgia's long-arm statute enables courts to exercise personal jurisdiction over a nonresident defendant who:

(1) Transacts any business within this state;

(2) Commits a tortious act or omission within this state, except as to a cause of action for defamation of character arising from the act; [or]

(3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives

substantial revenue from goods used or consumed or services rendered in this state[.]

O.C.G.A. § 9-10-91. "The statute 'must be read literally.'" Sanho Corp. v. KaiJet Tech. Int'l Ltd., Inc., 2020 WL 4346881, at *5 (N.D. Ga. July 29, 2020) (quoting Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc., 593 F.3d 1249, 1259 (11th Cir. 2010)).

The Court will consider whether Mr. Farmer has alleged sufficient facts to establish personal jurisdiction over Ms. Townsend under prongs one and three of Georgia's long-arm statute.[2]

### a. Prong one: Transacts any business in Georgia

To satisfy prong one of Georgia's long arm statute, Mr. Farmer must allege sufficient facts showing that Ms. Townsend "transacts any business" in Georgia. O.C.G.A. § 9-10-91(1). "'Transacts any business' requires that the nonresident defendant has purposefully done some act or consummated some transaction in Georgia." Glob. Payments Direct, Inc. v. Intelligent Payments, LLC, 2015 WL 13736621, at *2 (N.D. Ga. Mar. 6, 2015) (quoting Diamond Crystal Brands, Inc.,

---

[2] Based on the plain language of the O.C.G.A. § 9-10-91(2), the second prong of the long arm statute clearly does not apply in defamation cases, nor does Mr. Farmer argue that it applies. See Worthy v. Eller, 594 S.E.2d 699, 700 (Ga. Ct. App. 2004) ("The language of [prong two] is clear, unequivocal and unambiguous in mandating the exclusion of an action predicated on defamation.").

593 F.3d at 1264). Therefore, prong one "applies to nonresidents who conduct 'any' business in Georgia, which means 'to any extent' or 'in any degree.'" United States v. Billion Int'l Trading, Inc., 2012 WL 1156356, at *3 (N.D. Ga. Apr. 5, 2012) (quoting Diamond Crystal Brands, Inc., 593 F.3d at 1264 n.18).

"[A] defendant need not physically enter the state" to satisfy prong one of the long-arm statute. Diamond Crystal Brands, Inc., 593 F.3d at 1264. Rather, a court must consider "a nonresident's mail, telephone calls, and other 'intangible' acts . . . occurring while the defendant is physically outside of Georgia." Id.; see also Paxton v. Citizens Bank & Tr. of W. Ga., 704 S.E.2d 215, 219 (Ga. Ct. App. 2010) ("[I]t seems clear that Georgia 'allows the assertion of long-arm jurisdiction over [nonresident defendants based on] business conducted through postal, telephonic, and Internet contacts.'" (alternatives in original) (quoting ATCO Sign, etc. Co. v. Stamm Mfg., 680 S.E.2d 571, 576 (Ga. Ct. App. 2009))). "Therefore, [courts] examine all of a nonresident's tangible and intangible conduct and ask whether it can fairly be said that the nonresident has transacted any business within Georgia." Diamond Crystal Brands, Inc., 593 F.3d at 1264. Even a "'single event' may be a sufficient basis if 'its effects within the forum are substantial enough.'" Am. Coll. Connection, Inc. v. Berkowitz, 775 S.E.2d 226, 229 (2015).

19

Mr. Farmer alleges in his complaint that Ms. Townsend conducted business in Georgia by calling, communicating with, and interviewing Georgia residents as part of her investigation for the Nix Episodes. [Dkt. 1, at ¶¶ 23, 24].

In her declaration, Ms. Townsend makes the conclusory statement that she "did not transact business in the State of Georgia for the Elaine Nix murder podcasts," but otherwise does not refute Mr. Farmer's specific allegations. [Dkt. 7-2, at ¶ 5]. She agrees that she "did pull source materials from some sources in Georgia, such as open records requests," but asserts that she did not travel physically to Georgia for her investigation of Ms. Nix's murder. [Id. at ¶¶ 3, 5].

Ms. Townsend's lack of physical presence in Georgia while conducting these activities is immaterial. She affirmatively reached into the state to conduct her business, and the information she received from her interviews included the Walters Letter, which formed the basis for Mr. Farmer's defamation claim. Her communications and interviews with Georgia residents, as well as her open records requests to Georgia local governmental entities such as the Hall County Sheriff's Office, are sufficient to satisfy prong one of the long arm statute.

Additionally, Mr. Farmer alleges that Ms. Townsend conducted business in Georgia by working with the Georgia-based production company School of Humans, Ltd. (SOH) to produce the Nix Episodes, which paved the way for

20

publication of the allegedly defamatory statements. [Dkt. 1, at ¶¶ 25–29]. Ms.

Townsend agrees that the Nix Episodes were produced by SOH. [Dkt. 7-2, at ¶ 5].

Ms. Townsend's work with SOH on the Nix Episodes constitutes business in

Georgia and further strengthens the applicability of prong one of the Georgia long

arm statute.

In her Motion, Ms. Townsend relies on Henriquez v. El Pais

Q'Hubocali.com, 2012 WL 568246 (N.D. Ga. Feb. 21, 2012) for her argument that

the Georgia long arm statute does not apply to her and that the Court lacks

jurisdiction over her generally; however, in Henriquez, the only contact connecting

the defendant to the state of Georgia was that its allegedly defamatory statements

were seen and read in Georgia, and that the plaintiff resided in Georgia. See

Henriquez, 2012 WL 568246, at *1–2, aff'd, 500 F. App'x 824 (11th Cir. 2012).

Here, Mr. Farmer has alleged facts which show that Ms. Townsend has more

contacts in Georgia than just the publication of the Nix Episodes on the Internet—

specifically, her communication and interviews with Georgia residents and her

contractual relationship with Georgia-based company to produce her Podcast.

Therefore, Henriquez is not dispositive here.

### b. Prong three: Regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from Georgia

Although Ms. Townsend meets the requirements for prong one of the long arm statute, the Court will nevertheless evaluate prong three, which provides an additional route for satisfying the Georgia long-arm statute if "(1) Defendant[] 'commit[ted] a tortious injury in [Georgia]' and (2) Defendant[] 'regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from [Georgia].'" HD Supply Constr. Supply, Ltd. v. Mowers, 2020 WL 5774786, at *9 (N.D. Ga. Sep. 28, 2020) (quoting O.C.G.A. § 9-10-91(3)).

In his complaint, Mr. Farmer alleges that Ms. Townsend has been in an ongoing business relationship with Georgia-based production company SOH for the last six years, and pursuant to that relationship, SOH has produced over 100 episodes of the Podcast and continues to regularly produce the Podcast. [Dkt. 1, at ¶¶ 25–29]. Mr. Farmer further alleges that Ms. Townsend's podcasting work, which is her primary professional pursuit, requires her to communicate "constantly and consistently" with a Georgia company (SOH) and Georgia residents who work

at SOH. [Id. at ¶ 31, 32]. She also committed the allegedly tortious injury in the state of Georgia.

In her declaration, Ms. Townsend makes conclusory statements that she does not "do or solicit business in or from the State of Georgia," that she " [does] not derive revenue from goods or services used or consumed in the State of Georgia," and that she "[does] not transact business within the State of Georgia and [has] never transacted the business of podcasting in the State of Georgia." [Dkt. 7-2, at ¶ 4]. She also states that she never physically met with SOH in Georgia but does not refute Mr. Farmer's other specific allegations about her relationship with SOH. [Id. at ¶ 3]. However, her persistent and ongoing relationship with a Georgia company, which has produced over 100 episodes of her Podcast, constitutes a course of conduct sufficient for prong three of the long arm statute. See Heflin v. Advanced Draingage Sys., Inc., 2019 WL 13083570, at *3 (N.D. Ga. Dec. 16, 2019) (holding that a defendant met prong three of the Georgia long arm statute because it "regularly transacted in sales and shipped its products to Georgia on a consistent basis" for about five years).[3]

---

[3] Additionally, Ms. Townsend committed the alleged defamation in the state of Georgia, because under Georgia law, defamation occurs "not where the allegedly defamatory statement was issued but rather where [the plaintiff] was injured, that is, its domicile." Donald J. Trump for President, Inc. v. CNN Broad., Inc., 500 F. Supp. 3d 1349, 1354 (N.D. Ga. 2020).

Therefore, this Court has personal jurisdiction over Ms. Townsend under prongs one and three of the Georgia's long arm statute. Next, the Court turns to the Fourteenth Amendment due process requirements for personal jurisdiction.

### 2. Fourteenth Amendment Due Process

The Due Process Clause of the Fourteenth Amendment protects a defendant from being subjected to personal jurisdiction in a court without "fair warning," and requires "that the defendant's conduct and connection with the forum State [be] such that he should reasonably anticipate being haled into court there." Burger King Corp. v. Rudzewicz, 105 S. Ct. 2174, 2183 (1985). Due Process requirements are met when a defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Helicopteros Nacionales de Colombia, S.A. v. Hall, 104 S. Ct. 1868, 1872 (1984) (quoting Int'l Shoe Co. v. Washington, 66 S. Ct. 154, 158 (1945))).

Accordingly, the Court first looks to whether Ms. Townsend has the requisite minimum contacts with the forum state of Georgia, and then to whether jurisdiction over Ms. Townsend would offend traditional notions of fair play and substantial justice.

### c. Minimum Contacts

A defendant's minimum contacts with a forum state can be shown through general jurisdiction, which looks at whether one's contacts with a forum state are so "'continuous and systematic' as to render them essentially at home in the forum State," or specific jurisdiction, which looks more narrowly at the "'affiliatio[n] between the forum and the underlying controversy.'" Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011). "To permit the exercise of specific jurisdiction, there must first exist 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws,'" and "[s]econdly, the defendant's contacts with the forum must relate to the plaintiff's cause of action or have given rise to it." Oldfield v. Pueblo De Bahia Lora, S.A., 558 F.3d 1210, 1220 (11th Cir. 2009) (quoting Hanson v. Denckla, 78 S. Ct. 1228, 1240 (1958))); see also Diamond Crystl Brands, Inc., 593 F.3d at 1267 (determining that, to show minimum contacts under a specific jurisdiction theory, "the defendant must have 'purposefully availed' itself of the privilege of conducting activities—that is, purposefully establishing contacts—in the forum state and there must be a sufficient nexus between those contacts and the litigation").

The Court will address each of the dual requirements for establishing minimum contacts through a specific jurisdiction analysis in turn.

### i. Purposeful Availment

In intentional tort cases, courts may apply two different tests to ascertain the existence of purposeful availment—the traditional purposeful availment test or the "Calder effects test." Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1356 (11th Cir. 2013). Under both tests, the Court finds that Ms. Townsend purposefully availed herself of the privilege of conducting activities in Georgia.

Under the traditional purposeful availment test, courts "assess the nonresident defendant's contacts with the forum state and ask whether those contacts: (1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum." Id. at 1357. "In performing this analysis, we identify all contacts between a nonresident defendant and a forum state and ask whether, individually or collectively, those contacts satisfy these criteria." Id.

Here, Mr. Farmer has alleged in his complaint that Ms. Townsend's communicated with and interviewed Georgia residents about a murder that

occurred in Georgia with the intention of using the information obtained from the interviews as material in her Podcast, which has a nationwide scope through its streaming platforms available on the Internet. [Dkt. 1, at ¶¶ 17, 20–24]. The allegedly defamatory statements published in the Nix Episodes came from information gleaned by Ms. Townsend during her interviews and investigation, and it is reasonably foreseeable that discussing evidence such as the Walters Letter, which accuses a Georgia resident (who was not otherwise implicated in this crime) of murdering another Georgia resident, could expose Ms. Townsend to liability for defamation in a Georgia court.

Additionally, Ms. Townsend's contract with Georgia-based production company SOH provides another contact to the forum state. The Eleventh Circuit has held that

> [i]t is settled that entering a contract with a citizen of another state, standing alone, does not automatically satisfy the minimum contacts test. Rather, when inspecting a contractual relationship for minimum contacts, we follow a 'highly realistic approach' that focuses on the substance of the transaction: prior negotiations, contemplated future consequences, the terms of the contract, and the actual course of dealing.

Diamond Crystal Brands, Inc., 593 F.3d at 1268. When analyzing contracts under the purposeful availment test, "each individual transaction involve[s] a meaningful contact with Georgia." Id. at 1269 (holding that a defendant company "established

a substantial and ongoing relationship with a Georgia manufacturer" where it

"purposefully engage[d] in fourteen . . . transactions in just six months").

Here, as alleged by Mr. Farmer in his complaint, Ms. Townsend has been in

an ongoing contractual relationship with SOH for the past six years and seemingly

intends to continue her relationship with it. Pursuant to its contract with Ms.

Townsend, SOH has produced over 100 Podcast episodes. If each episode

production counts as a singular transaction, then Ms. Townsend has purposely

engaged in over 100 transactions with SOH in the past six years and intends to

continue to work with SOH to produce her Podcast, which is her primary

professional pursuit and now utilizes a "murder line" format instead of focusing on

one murder per season, which expands the number of episodes each year.[4] The

high frequency of transactions between Ms. Townsend and SOH, as well as the

ongoing nature of their business relationship and the communication necessary for

continuing the relationship, makes their contract another sufficient minimum

contact with the forum state of Georgia. See Diamond Crystal Brands, Inc., 593

F.3d at 1269 ("Jurisdiction is often found where further contacts or plus factors

connect the defendant to the jurisdiction.").

---

[4] In her declaration, Ms. Townsend did not address nor refute any of Mr. Farmer's allegations pertaining to her contractual relationship with SOH, except to say that she never physically travelled to Georgia to meet with SOH. [See Dkt. 7-2].

Furthermore, in cases of intentional tort claims such as defamation,[5] courts may apply the Calder effects test, where "a nonresident defendant's single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum state." Mosseri, 736 F.3d at 1356–57. "[T]he effects test requires a showing that the defendant (1) committed an intentional tort (2) that was directly aimed at the forum, (3) causing an injury within the forum that the defendant should have reasonably anticipated." Gregory v. Mihaylov, 2013 WL 75773, at *5 (N.D. Ga. Jan. 4, 2013) (applying the Calder effects test to analyze personal jurisdiction related to a Georgia defamation claim). To satisfy the Calder effects test, "[t]he defendant must have "expressly aim[ed] his wrongful conduct, individually targeting a known forum resident." Id. at *6.

In the context of a defamation claim, a defendant expressly aims their conduct when the forum state is the "focal point" of the defamatory statements and the harm suffered, and where "under the circumstances, [defendants] must

---

[5] Courts applying Georgia law have treated defamation as an intentional tort, both in the personal jurisdiction context and attorneys' fees context. See Gregory v. Mihaylov, 2013 WL 75773, at *5 (N.D. Ga. Jan. 4, 2013) (applying Calder effects test to determine personal jurisdiction in a Georgia defamation case); see Diagnostic Reference Grp., LLC v. Robb, 2016 WL 11721081, at *6 (N.D. Ga. May 5, 2016) ("Significantly, defamation is an intentional tort and '[e]very intentional tort invokes a species of bad faith that entitles a person wronged to recover the expenses of litigation including attorney fees.'" (quoting Todd v. Byrd, 640 S.E.2d 652, 661 (Ga. App. 2006))).

'reasonably anticipate being haled into court there' to answer for the truth of the statements made in their [publication]." Calder v. Jones, 104 S. Ct. 1482, 1486–87 (1984) (holding that the defendants had satisfied minimum contacts in the forum state of California because "[t]he allegedly libelous story concerned the California activities of a California resident," "it impugned the professionalism of an entertainer whose television career was centered in California," and "[t]he article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California"); see also Licciardello v. Lovelady, 544 F.3d 1280, 1288 (11th Cir. 2008) (holding, in a case involving trademark infringement, that "the unauthorized use of [plaintiff's] mark, therefore, individually targeted [plaintiff] in order to misappropriate his name and reputation for commercial gain" and that minimum contacts were satisfied because defendants "expressly aimed at a specific individual in the forum whose effects were suffered in the forum").

Mr. Farmer alleges in his complaint that Ms. Townsend expressly aimed her statements at Georgia because Ms. Nix's murder occurred in Georgia, she investigated the Georgia murder by calling and interviewing known Georgia residents, and she hoped to cultivate additional sources for more content related to the Nix Episodes from Georgia listeners. [Dkt. 1, at ¶¶ 18–24]. Ms. Townsend does

not refute these specific allegations in her declaration. [See Dkt. 7-2]. Based on her statements in the Nix Episodes, Ms. Townsend knew that Mr. Farmer was a Georgia resident and business-owner when she discussed his potential involvement with the murder; and thus, she should have reasonably anticipated having to answer for the truth of her statements in a Georgia court.

Therefore, Ms. Townsend has purposefully availed herself of doing business in Georgia, both under the traditional purposeful availment analysis and the Calder effects test. The Court turns its focus to the second part of the minimum contacts analysis.

### ii.  Claim arising out of or related to forum contacts

The second part of the Court's minimum contacts analysis is "that plaintiff's claim must 'arise out of or relate to' at least one of defendant's contacts with the forum." Oldfield, 558 F.3d at 1220. The Eleventh Circuit has not adopted a rigid approach to determining when contacts "arise out of or relate to" a cause of action; however, "the contact must be a 'but-for' cause of the alleged tort and that the purposeful contact must be such that the out-of-state resident will have fair warning that a particular activity will subject [it] to the jurisdiction of a foreign sovereign . . . .'" Diamond Crystal Brands, Inc., 593 F.3d at 1273; see Oldfield, 558 F.3d at 1224 (determining that, while "flexibility is essential to the

31

jurisdictional inquiry . . . the fact-sensitive inquiry must hew closely to the foreseeability and fundamental fairness principles forming the foundation upon which the specific jurisdiction doctrine rests").

Here, but for Ms. Townsend's communication and interviews with Georgia residents during her investigation of Ms. Nix's murder, she would not have found the Walters Letter and published the statements that formed the basis for Mr. Farmer's defamation claim. Additionally, it is foreseeable that a Georgia defamation claim might arise from interviewing and communicating with Georgia residents with the purpose of gaining information to publish on her Podcast.

Additionally, but for SOH's production of the Nix Episodes pursuant to its contract with Ms. Townsend, the allegedly defamatory statements would not have been published. It is foreseeable that partnering with a Georgia-based company could open one up to claims related to the publication of the episodes produced by that company, thereby alerting Ms. Townsend to the possibility of being haled into Georgia courts for an issue related to her Podcast.

Therefore, Ms. Townsend's Georgia contacts, including her communication and interviews with Georgia residents and contract with Georgia-based production company SOH, gave rise to and are related to Mr. Farmer's ensuing defamation claim. Ms. Townsend has thereby established minimum contacts with the forum

state of Georgia such that it is fair and foreseeable for her to be haled into court in the state.

Next, the Court looks to whether personal jurisdiction over Ms. Townsend comports with notions of fair play and substantial justice.

### d. Comports with Notions of Fair Play and Substantial Justice

Courts consider the following factors to determine whether personal jurisdiction comports with notions of fair play and substantial justice: "'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several states in furthering fundamental substantive social policies.'" Diamond Crystal Brands, Inc., 593 F.3d at 1274.

Here, Ms. Townsend has not explained how litigating in a Georgia court would put an undue burden on her. Therefore, the Court finds that its exercise of personal jurisdiction over her does not run afoul of notions of fair play and substantial justice. See id. (determining that personal jurisdiction over defendant in the forum state is fair because defendant "has not presented the requisite

33

'compelling case' that exercising jurisdiction would be unconstitutionally unfair"

and that defendant "does not even attempt to explain why litigating in Georgia

would be especially onerous, much less how any such inconvenience achieves a

'constitutional magnitude'").

Therefore, this Court's personal jurisdiction over Ms. Townsend comports

with Georgia's long arm statute and Fourteenth Amendment due process, and Ms.

Townsend's Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Rule

12(b)(2) [Dkt. 7] is **DENIED**. Assured of its jurisdiction over Ms. Townsend, the

Court now turns to her Motion to Dismiss for Failure to State a Claim.

## III.   Ms. Townsend's Motion to Dismiss for Failure to State a Claim for Defamation

### A. 12(b)(6) Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a

"short and plain statement of the claim showing that the pleader is entitled to

relief." FED. R. CIV. P. 8(a)(2). While this pleading standard does not require

"detailed factual allegations," "labels and conclusions" or "a formulaic recitation

of the elements of a cause of action will not do." Ashcroft v. Iqbal, 129 S. Ct.

1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964–65

(2007)). To withstand a motion to dismiss, "a complaint must contain sufficient

34

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 127 S. Ct. at 1974). A claim to relief is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. Id.

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). However, the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 129 S. Ct. at 1949). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 129 S. Ct. at 1949. Furthermore, the Court does not "accept as true a legal conclusion couched as a factual allegation." Twombly, 127 S. Ct. at 1965.

**B.    Analysis**

In her Motion, Ms. Townsend moves to dismiss Mr. Farmer's defamation claim, the sole claim in the Complaint, for failure to state a claim. [See generally Dkts. 1, 7-1]. First, the Court will review the statements Mr. Farmer alleges are defamatory, and then it will look to whether he sufficiently pled a Georgia defamation claim in his complaint.

Under Georgia law, a defamation claim has four elements: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or actionability of the statement irrespective of special harm." Mathis v. Cannon, 573 S.E.2d 376, 380 (Ga. 2002); Am. C.L. Union, Inc. v. Zeh, 864 S.E.2d 422, 427 (Ga. 2021). Georgia law also recognizes certain categories of defamation where harm to the plaintiff is inferred, called "defamation per se." See O.C.G.A. § 51-5-4. Mr. Farmer brings his defamation claim pursuant to O.C.G.A. § 51-5-4(a)(1), which includes statements "imputing to another a crime punishable by law" as defamation per se. Id.

### 1. Allegedly Defamatory Statements

Mr. Farmer identifies multiple statements in the Nix Episodes which he alleges assert or imply per se defamatory facts about him—namely, that they impute multiple crimes to him, including but not limited to the murder, kidnapping, and sexual assault of Ms. Nix. [Dkt. 1, at ¶¶ 112–21].

### a. Statements from the May Nix Podcast

Mr. Farmer alleges in his complaint that Ms. Townsend's following statements from the May Nix Podcast defame him:

(1) "[T]his businessman confessed that he and some other people kidnapped Elaine after offering her money for unknown reasons."

(2) "The guys started drinking, smoking some pot, and having a good time, and they decided to drive around."

(3) "I offered the girl one hundred dollars to spend some time with us if she was over eighteen."

(4) "She tried to get to her car, but we quickly cut her off."

(5) "She said if we did not leave her alone, she was going to start screaming for help."

(6) "Danny really flew off the handle and went after her."

(7) "He [Farmer] slapped her, turned her around, and grabbed her from behind."

(8) "He [Farmer] covered her face, nose, and mouth with one hand, and the life went out of her."

(9) "His hand swallowed her face whole."

(10) "She could not breathe."

(11) "She fell slowly back against him [Farmer], but he pushed her off to the ground."

(12) "We thought she had just passed out."

(13) "He [Farmer] wanted her in the back seat with him, so he moved her in there."

(14) "Danny was sitting there, laughing, fondling the girl, and at the same time was holding her tight so she could not get away when she woke up."

(15) "She never woke up."

(16) "When we got to the Kangaroo, that's a nearby gas station, I realized she was dead."

(17) "Johnny and I were shocked over what we'd maybe done."

(18) "Danny got madder than hell and started yelling. I wanted to take the girl back to Zack's. Johnny never said a word, but Danny said to drive him onto Johnny's and he would handle the situation."

(19) "What we'd agreed on was no cops."

(20) "We were half drunk, you could smell the pot, and now a possible dead girl was with us."

(21) "I'm going to stop for a minute and just say this is so horrifying as a human being, as a woman, I can't imagine anything worse than being dead or dying, needing help and having these predators, there's no other word for it, treating me like a piece of meat, passing me around in that back seat while I'm basically paralyzed. If this is true, they were treating her like she was

nothing. They had zero regard for her humanity. They knew she was in trouble, and instead of trying to help her, they were preying on her."

(22) "[T]he person who claims to be Jim goes on to say that at that point they were panicking."

(23) "Danny apparently threw Elaine's body, that's how he referred to it, into the back of his truck, and then, . . . they took Johnny home. . . . [H]e seemed pretty traumatized, but said he wouldn't say anything."

(24) "[H]e followed Danny to get rid of the body."

(25) "At that point, he and Danny started kind of a debate. Should they throw the body into Lake Lanier or throw her into a bin at an antique supply company."

(26) "So according to Jim, he followed Danny out to this company out on the highway." Now, this was the other way, quite a few miles the other way from where Elaine's body was dumped."

(27) "They did think about dumping her in the lake. They were worried about someone passing by, possibly the police."

(28) "He claimed that once they got to that destination, he helped Danny throw Elaine's body into one of these bins."

(29) "He said he called Danny and said, whatever you do, don't let anyone find the body because our DNA could be on it now."

(30) "And he claims Danny told him that he was going to move the body."

(31) "Danny might be targeting another young woman. He said he could not live with that if it happened. His last words were, 'This needs to stop, remorsefully J.A. Walters.'"

[Dkt. 1, at ¶ 74(a)–(ee)]. Mr. Farmer argues that the statements convey per se defamatory facts about him: specifically, that Mr. Farmer illegally solicited, assaulted, battered, kidnapped, murdered, and sexually assaulted Ms. Nix; dumped and moved Ms. Nix's dead body; and that he failed to report his and his accomplices' purported crimes, all of which Mr. Farmer refutes in his complaint. [Id. at ¶¶ 75, 76].

### b. Statements from the June Nix Podcast

Mr. Farmer alleges in his complaint that Ms. Townsend's following statements from the June Nix Podcast defame him:

(32) "[T]his confession letter, the one that's supposedly written by a local businessman named James A. Walters, a/k/a Big Jim. . . .

(33) "[W]e don't know for sure if this letter's authentic.

40

(34) "Big Jim confessed that he and two other men, Danny and Johnny, had kidnapped Elaine and accidentally caused her death."

(35) "They went up to her, and Jim said they offered her money one hundred dollars for sex, which he said she refused."

(36) "He said that at that point Danny grabbed her.

(37) "She started screaming, and that quote 'Danny really flew off the handle and went after her.'"

(38) "He [Farmer] slapped her, turned her and grabbed her from behind."

(39) "He [Farmer] covered her face, nose and mouth with one hand, and the life went out of her."

(40) "His [Farmer's] hand swallowed her face whole. She could not breathe."

(41) "Jim went on to say that Elaine passed out and Danny pulled her into the car with them and then started holding her tight. That was the way he put it in the letter."

(42) "At some point, Jim said they realized that Elaine was dead."

(43) "After that, Jim said that Danny put Elaine's lifeless body into his truck, and he, Jim, took Johnny home."

(44) "Then he said he followed Danny to a location where they put her body out in White County."

(45) "He said that they threw the body in a bin."

(46) "[Walters] told Danny he was worried about someone finding the body and about their fibers being on Elaine's body and her clothing."

(47) "Jim claimed that Danny told him that he was going to move the body."

(48) "He [Walters] closes the letter by writing, quote, '[T]he reasons I'm coming forward now are twofold. The remorse and grief I feel for the Nix family is unbearable. I've lost many hours of sleep since the incident and prepared for the consequences that may lie ahead. I ask for forgiveness. Of the Nix family, the City of Gainesville, but most important, our Lord Jesus Christ, please forgive me."

(49) "He [Walters] closes with, 'This needs to stop remorsefully J.A. Walters.'"

(50) "Just like Big Jim stated in the letter."

(51) "The letter also made a reference to Danny liking blonde women."

(52) "So what happened to Elaine's clothes? Did Jim leave that part out from the letter because it might not have been flattering to these guys, or did something happen afterwards?"

(53) "If Jim was telling the truth in that letter, could that have been Danny or someone else who when they moved the body were thinking about the possibility of those fibers, or if he was telling the truth, could Danny or Danny and someone else have moved the body later and that would be when Elaine's clothes were removed."

(54) "Maybe they were thinking about the possibility of fibers being on that clothing and then wanted to protect themselves from that, or maybe they were hoping that Elaine's body would not be identified."

(55) "And yet in the letter, which was supposedly written by Jim Walters, it says specifically Danny grabbed her at the gas station, put his hand over her face and so she basically wasn't able to breathe and she died, which would on the surface appear to match the physical evidence the autopsy report states suffocation was a possibility."

[Id. at ¶ 85(a)–(x)]. Mr. Farmer argues that the statements in the June Nix Episode convey per se defamatory facts about him: specifically, that Mr. Farmer illegally solicited, assaulted, battered, kidnapped, murdered, and sexually assaulted Ms. Nix; dumped and moved Ms. Nix's dead body; and that he failed to report his and his accomplices' purported crimes, all of which Mr. Farmer refutes in his complaint. [Id. at ¶¶ 86, 87].

The allegedly defamatory statements from both the Nix Episodes may be sorted into two different categories: first, statements quoting or paraphrasing the Walters Letter (Statements 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51); and second, statements discussing and extrapolating details from the Walters Letter (Statements 21, 52, 53, 54, 55), including comparing the details to other aspects of the case, such as the autopsy report.

### 2. Elements of a Georgia Defamation Claim

At the outset of its analysis, the Court addresses Ms. Townsend's contention that she should not be held liable for her statements reading or paraphrasing the Walters Letter since she did not write the Letter herself. [Dkt. 7-1, at 20]. Georgia defamation law follows the rule that "talebearers are as bad a talemakers," and holds republishers liable for libel or slander even where the statements originate from a third person. Baskin v. Rogers, 493 S.E.2d 728, 730 (Ga. Ct. App. 1997) (quoting Ivester v. Coe, 127 S.E. 790, 792 (Ga. Ct. App. 1925)); see Amin v. NBCUniversal Media, LLC, 2024 WL 3188768, *14 (S.D. Ga. June 26, 2024) ("[E]very repetition of a slander originated by a third person is a willful publication of it, rendering the person so repeating it liable to an action, and it is no defense

44

that the speaker did not originate the slander, but heard it from another, even though he in good faith believed it to be true." (quoting Ivester, 127 S.E. at 790)), reconsideration denied, 2024 WL 4016377 (S.D. Ga. Aug. 15, 2024). Therefore, Ms. Townsend cannot escape liability because the accusations in her statements were taken and republished from the Walters Letter, which she did not write.

As discussed above, a Georgia defamation claim requires the plaintiff to show "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or actionability of the statement irrespective of special harm." Zeh, 864 S.E.2d at 427. The Court turns to the first element of a defamation claim—whether Ms. Townsend's statements were false and defamatory. At the motion to dismiss stage, the plaintiff's allegations as to the falsity of the statements are accepted as true,[6] so the focus of the Court's analysis turns on whether Mr. Farmer sufficiently alleged that Ms. Townsend's statements state or imply defamatory facts about him within the context of the Episodes as a

---

[6] See No Witness, LLC v. Cumulus Media Partners, LLC, 2007 WL 4139399, at *7 (N.D. Ga. Nov. 13, 2007) ("Plaintiff has asserted that the statements that he was fired are false. This is sufficient to survive a motion to dismiss because all facts are to be construed in his favor.").

45

whole, and that Ms. Townsend's statements are not merely statements of her opinion.

### a. False Statement

The first element of a Georgia defamation claim is a false and defamatory statement. Zeh, 864 S.E.2d at 427. "[T]ruth is a 'perfect defense' to a defamation action." Lucas v. Cranshaw, 659 S.E.2d 612, 615 (Ga. Ct. App. 2008); see Bryant v. Cox Enters., Inc., 715 S.E.2d 458, 464 (Ga. Ct. App. 2011) ("Defamation law overlooks minor inaccuracies and concentrates upon substantial truth. In other words, [a] statement is not considered false unless it would have a different effect on the mind of the viewer from that which the pleaded truth would have produced." (internal citations and quotations omitted)). The plaintiff bears the burden of proving falsity. See Bryant, 715 S.E.2d at 463.

Mr. Farmer argues that Ms. Townsend's statements reading and extrapolating details from the Walters Letter are false because the accusations in the Walters Letter are false. [Dkt. 1, at ¶¶ 75, 76, 86, 87]. Ms. Townsend argues that her statements are entitled to a truth defense because she accurately read the contents of the Walters Letter and because her statements about the Walters Letter accurately characterized its contents. [Dkt. 7-1, at 21–22].

Here, Ms. Townsend is not entitled to a truth defense for her statements reading and paraphrasing the Walters Letter—since she has adopted the statements in the Letter as her own through republisher liability, the Court's inquiry turns on the falsity or truth of the underlying statements in the Walters Letter, *not* on the accuracy of Ms. Townsend's retelling. See Amin, 2024 WL 3188768, at *16 (determining that, when looking at the falsity of allegedly defamatory statements, "[i]t does not matter that [the defendant] did not make these accusations directly, but only republished the whistleblower letter's allegations" and that the republished allegations forming the basis of the letter must be assessed for falsity). Since Mr. Farmer alleges in his complaint that all of Ms. Townsend's statements, including the allegations in the Walters Letter, are false, he has met his burden to show falsity at this motion to dismiss stage. See No Witness, LLC, 2007 WL 4139399, at *7 ("Plaintiff has asserted that the statements that he was fired are false. This is sufficient to survive a motion to dismiss because all facts are to be construed in his favor.").

Ms. Townsend also argues that some of her statements about Mr. Farmer in the Nix Episodes were accurate and uncontested by Mr. Farmer: specifically, that he owns a grading company, that his deceased wife was blonde, and that he associated with the other men mentioned in the Walters Letter. [Dkt. 7-1, at 22].

However, these three statements are not included in those statements for which Mr. Farmer is alleging defamation, and the fact that Mr. Farmer has not proven the falsity of these three details from the Nix Episodes will not prevent him from satisfying the falsity element.

Therefore, Mr. Farmer has sufficiently alleged the falsity of the statements at this stage. The Court next looks to whether Mr. Farmer has sufficiently alleged that the statements are defamatory in nature.

### b. Defamatory Statement

A statement is defamatory if (1) the statement reasonably can be interpreted as stating or implying defamatory facts about the plaintiff, and (2) if the defamatory assertions are capable of being proven false. Harcrow v. Struhar, 511 S.E.2d 545, 546 (Ga. Ct. App. 1999). "As a general rule, the question whether a particular publication is libelous, that is, whether the published statement was defamatory, is a question for the jury. However, if the statement is not ambiguous and can reasonably have but one interpretation, the question is one of law for the judge." Mead v. True Citizen, Inc., 417 S.E.2d 16, 17 (Ga. Ct. App. 1992) (citations omitted).

First, the Court will assess whether Mr. Farmer sufficiently alleged that Ms. Townsend's statements can reasonably be interpreted as stating or implying

48

defamatory facts about himself. Next, the Court will determine whether Mr. Farmer sufficiently alleged that Ms. Townsend's statements are capable of being proven false and are not statements of pure opinion.

### i. Statements that can reasonably be interpreted as stating or implying defamatory facts about the plaintiff

As stated above, when determining whether a statement is defamatory, Georgia courts look to whether the statements reasonably can be interpreted as stating or implying defamatory facts about the plaintiff. Harcrow, 511 S.E.2d at 546. When considering whether statements could be reasonably construed as defamatory, courts must look at the statements in the context of their publication. See Lucas, 289 S.E.2d at 615 ("A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it." (quoting Constitution Pub. Co. v. Andrews, 177 S.E. 258, 259 (Ga. Ct. App. 1934))); see Echols v. Lawton, 913 F.3d 1313, 1321 (11th Cir. 2019) ("When we consider whether a statement is defamatory, we 'read and construe the publication as a whole, and in the sense in which the readers to whom it is addressed would understand it.'" (quoting Hoffman-Pugh v. Ramsey, 312 F.3d 1222, 1225 (11th Cir. 2002))); see Cox Enters., Inc. v. Nix, 560 S.E.2d 650, 652

(Ga. 2002) ("In considering whether a writing is defamatory as a matter of law, we look at what construction would be placed upon it by the average reader." (quoting Mead, 417 S.E.2d at 17)).

Mr. Farmer argues that Ms. Townsend's statements convey per se defamatory facts about Mr. Farmer—specifically, her statements from the Nix Episodes state or imply that he illegally solicited, assaulted, battered, kidnapped, murdered, and sexually assaulted Ms. Nix; that he dumped and moved Ms. Nix's body; and that he failed to report his and his accomplices' purported crimes. [Dkt. 1, at ¶¶ 74, 75, 85, 86, 118].

Ms. Townsend argues that her statements are not defamatory because no reasonable listener would interpret them as accusing Mr. Farmer of committing the aforementioned crimes. [Dkt. 7-1, at 4, 16–17, 20–21]. She argues that because the "gist" of the Nix Episodes focuses on the investigation surrounding Ms. Nix's murder, and not just the Walters Letter, that a reasonable listener would not understand her statements to be definitively asserting or implying defamatory facts about Mr. Farmer. [Id.; Dkt. 19, at 3–11]. Ms. Townsend also argues that she "presented the assertions in the Walters letter against a more than fair backdrop," with repeated warnings that the letter could be a hoax and a statement from an interviewee who said she did not believe the letter was real. [Dkt. 7-1, at 12–13].

50

Multiple Georgia defamation cases shed light upon the question of whether a reasonable listener might understand Ms. Townsend's statements as stating or implying defamatory facts about Mr. Farmer within the context of the Episodes as a whole. In Wolf v. Ramsey, 253 F. Supp. 2d 1323 (N.D. Ga. 2003), the plaintiff brought a Georgia defamation claim against the Ramsey defendants based on a book they wrote about their daughter's famously unsolved murder. Wolf, 253 F.Supp.2d at 1326, 1350. In their book, the defendants stated that soon after the murder, they received a phone call from the plaintiff's girlfriend who suspected that the plaintiff might be connected to the murder. Id. at 1350–51. The defendants also stated in their book that the plaintiff had been briefly questioned by the police about the murder of their daughter, but the police had determined that he was not a suspect. Id. at 1351. However, the defendants wrote that "[w]hatever the police's intentions, [the plaintiff] went on our suspect list. He represented too many unanswered questions." Id. The book further stated that the defendants had heard information that the plaintiff had once gone into "an angry tirade aimed at [Ms. Ramsey]" after reading an article about a company she worked for, and the book included a "profile" of the suspected murderer which matched many of the plaintiff's characteristics. Id.

51

Even though the defendants did not specifically accuse the plaintiff of murdering their daughter, the court in Wolf noted that the defendants' statements in their book "indicate that defendants and others considered plaintiff to be a potential suspect in the brutal murder of a child and also suggest that there was some basis for the suspicion," and that "ultimately, the inference one draws from the passage is the defendants' belief, not that plaintiff actually killed their daughter, but that there is reason to suspect that he might have." Id. Accordingly, the court held that the statements were defamatory because "the 'sting' or 'gist' of the passages in the Book suggest that plaintiff is a viable suspect in the murder. Such an accusation is defamatory."[7] Id. at 1352.

Based on Mr. Farmer's well-pled allegations in the complaint, Ms. Townsend read and discussed the Walters Letter's accusations against Mr. Farmer in Nix Episodes, and while she did not wholly endorse the accuracy of the Letter, she also did not completely deny its accuracy, and even went so far as to say that even though the police disregarded it, that she was "blown away because unless I'm missing something, I totally disagree with the police assessment." [Dkt. 1-1, at

_____

[7] Ultimately, the court in Wolf held that the defamatory statements were not actionable because the plaintiff, who stipulated to the fact that he was a public figure, failed to meet his burden of showing the defendants' actual malice in the publication of the statements. Wolf, 253 F.Supp.2d at 1352–63.

9]. After reading the Walters Letter, she stated that it needed to be investigated further to "find out, is this letter real?" and at the end of the June Nix Episode, after "investigating" the letter by comparing it to other details in the case, she continued to tell listeners that the letter might be real, and that she was "still trying to figure our what happened with the letter that was supposedly written by Jim Walters." [Dkt. 1-1, at 14; Dkt. 1-2, at 12]. These statements, along with others made by Ms. Townsend and the accusations read directly from the Walters Letter, parallel the Wolf defendants' statements indicating that there was a genuine basis to suggest that the plaintiff committed a "brutal murder," among other heinous crimes.

Ms. Townsend argues that her statements cannot be defamatory because the "gist" of the Nix Episodes focuses on the investigation into Ms. Nix's murder, not solely on the Walters Letter. [Dkt. 19, at 3–11]. In the first half of the May Nix Episode, Ms. Townsend recapped the background of Ms. Nix's murder, discussing the results of the autopsy report, and discussing other potential leads, and spent the second half reading and discussing the Walters Letter. [Dkt. 1-1]. Similarly, in the June Nix episode, Ms. Townsend began by recapping the contents of the Walters Letter, then discussed various aspects of Ms. Nix's murder case and investigation but returned multiple times to further discuss the Walters Letter and to compare it to the autopsy report. [Dkt. 1-2].

However, the fact that Ms. Townsend discussed other aspects of the investigation besides just the Walters letter in her Episodes does not mean that her statements about the Walters Letter cannot be defamatory. In Wolf, the Ramsey defendants similarly discussed multiple facets of their daughter's murder in their book, but the court still determined that their statements treating the plaintiff as a potential suspect were capable of defamatory meaning where the "'sting' or 'gist' of the passages in the [publication] suggest that plaintiff is a viable suspect in the murder." Wolf, 253 F. Supp. 2d at 1352.

Ms. Townsend relies upon the case Amin v. NBCUniversal Media, LLC, 2024 WL 3188768 (S.D. Ga. June 26, 2024), reconsideration denied, 2024 WL 4016377 (S.D. Ga. Aug. 15, 2024) to show that her statements cannot be defamatory; however, her reliance is misplaced. In Amin, the plaintiff brought a defamation suit against the defendant for its statements discussing a letter accusing the plaintiff of performing mass, unconsented hysterectomies on women at an ICE detention facility. See id. at *1–2. The court in Amin held that one publication of the allegations, the "September 17th Episode," was not defamatory because the show focused on the investigation into the plaintiff's conduct, every statement about the plaintiff was true, and the accusations in the letter were repeated "in the context of discussing the investigation" and "were repeated not as statements of

54

fact but as explanatory references to understand the scope of the Homeland Security investigation." Id. at *21. Conversely, the Amin court held that the defendant's other publications repeating the allegations about the plaintiff were defamatory because the context of those publications treated the letter's allegations as "breaking news," and the hosts read the allegations in the letter and speculated as to certain aspects of the letter. Id. at *4, 16–17. The Amin court found the publications to be defamatory despite the fact that the publications repeated multiple disclaimers, such as "[t]hat said[,] in general, anonymous, unproven allegations, made without any fact-checkable specifics, should be treated with the appropriate skepticism they deserve," and presented some information refuting the validity of the allegations. See id. at *5, *9.

Ms. Townsend argues that the "gist" of the Nix Episodes is similar to the September 17th Episode in Amin because they discuss multiple different aspects of the investigation into Ms. Nix's murder, and that her statements are therefore not defamatory. [Dkt. 19, at 3–5]. However, unlike in the September 17th Episode from Amin, Ms. Townsend reads and paraphrases the Walters Letter and focuses significant portions of each episode on discussing the Letter in the Nix Episodes. Additionally, although she spends some time discussing the Hall County police investigation in both episodes, much of the "investigation" in the two episodes is

55

her own and includes speculation which goes beyond the Letter or the police records. Therefore, she cannot rely on cases where the courts hold that statements which appear in news coverage of a *police* investigation are not defamatory. Cf. Bryant v. Cox Enters., Inc., 715 S.E.2d 458, 466 (Ga. Ct. App. 2011) (holding that statements from a media outlet about the FBI's suspicion of the plaintiff regarding a bombing incident was not defamatory because, in the context of the news story, "a reasonable reader would have understood the information to be preliminary in nature and published during the very early stages of an ongoing investigation").[8]

The Court finds that Mr. Farmer has met his pleading burden as to the first element of his defamation claim: a false and defamatory statement. Next, the Court looks to the second element of defamation: a privileged communication to a third party. Zeh, 864 S.E.2d at 427.

### ii. Statements capable of being proven false

The second aspect of a defamatory statement is that it must be capable of being proven false. Harcrow, 511 S.E.2d at 546. A statement of pure opinion is

---

[8] Ms. Townsend's reliance on Cottrell v. Smith is similarly misplaced. Cottrell, 788 S.E.2d at 783. The majority of the Georgia Supreme Court's holding in Cottrell is based on the plaintiff's failure to show that the defendant acted with "actual malice," and Ms. Townsend does not elaborate on how the language she cited from Cottrell specifically applies to her statements. Id. at 784–85.

incapable of being proven false and therefore cannot support a defamation claim.

See Infinite Energy, Inc. v. Pardue, 713 S.E.2d 456, 460–61 (Ga. Ct. App. 2011)

(holding that statements about plaintiff which were based on quantifiable facts

such as market rates for natural gas were capable of being proved false, and

therefore not mere statements of opinion).

However, "[t]here is no wholesale defamation exemption for anything that

might be labeled opinion." Lively v. McDaniel, 522 S.E.2d 711, 713 (Ga. Ct. App.

1999). "An opinion can constitute actionable defamation if the opinion can

reasonably be interpreted, according to the context of the entire writing in which

the opinion appears, to state or imply defamatory facts about the plaintiff that are

capable of being proved false." Gettner v. Fitzgerald, 677 S.E.2d 149, 154 (Ga. Ct.

App. 2009) (holding that "[the defendant] cannot avoid liability solely by labeling

an allegedly defamatory report about the plaintiff's poor job performance as an

'opinion'").

When looking at a potentially defamatory statement couched in language of

opinion and disclaimers (e.g.: "I think that . . ."; "It's possible that . . ."; "I might

be wrong, but . . ."), Georgia courts consider that:

> [A] defendant is not spared from liability simply by couching an alleged
> defamatory falsehood in the context of an opinion, be it the defendant's
> own opinion or that of a third-party. . . As illustrated by the Supreme
> Court of the United States in Milkovich v. Lorain Journal Co., "the

statement, 'I think Jones lied,' may be provable as false on two levels [;] [f]irst, that the speaker really did not think Jones had lied but said it anyway, and second that Jones really had not lied." When examining whether a statement is actionable under the second level in the Milkovich analysis, "[t]he pivotal questions are whether [the challenged statement] can reasonably be interpreted as stating or implying defamatory facts about plaintiff and, if so, whether the defamatory assertions are capable of being prove[n] false."

Bryant, 715 S.E.2d at 464 (internal footnotes and quotations omitted);

see, e.g., Dougherty v. Harvey, 317 F. Supp. 3d 1287, 1291 (N.D. Ga. 2018)

(finding that the defendant's statement that the plaintiff "may or may not be

HIV positive" only had one meaning that was defamatory to the plaintiff,

despite the defendant couching the statement in uncertain language); see,

e.g., Harcrow, 511 S.E.2d at 546 (reasoning that "[t]he fact that [the

defendant] included in the writing a statement that, 'I'm not saying that they

are responsible for this atrocious act,' does not negate other portions of the

writing that the jury was entitled to conclude were the equivalent of

imputing a crime to the [plaintiffs]," and could not be exempted as an

opinion statement); see, e.g., StopLoss Specialists, LLC v. VeriClaim, Inc.,

340 F. Supp. 3d 1334, 1352 (N.D. Ga. 2018) (finding that the defendant's

statement that "this appears to be insurance fraud" is not exempt from a

defamation claim as the defendant's opinion because "a natural reading of

the statement, even considering [the defendant's] use of the qualifying

phrase 'this appears,' would lead the average reader to the conclusion that the writing, on its face, is stating a defamatory fact about the Plaintiffs that can potentially be proven false"); see, e.g., Johnson v. Lindsay Pope Brayfield & Assocs., Inc., 875 S.E.2d 856, 862 (Ga. Ct. App. 2022) ("[The defendant's] statement that [the plaintiff] had gone on a 'rampage' was a subjective assessment of [the plaintiff's] behavior. Likewise, [the defendant's] assertion that [the plaintiff] was 'a strong candidate for a mass shooting' was an expression of opinion."); see, e.g., Swanson Towing & Recovery, LLC v. Wrecker 1, Inc., 802 S.E.2d 300, 305 (Ga. Ct. App. 2017) ("Here, the defendants' statements characterizing the plaintiffs as without morals and as "mean, vulgar, demeaning[ ] crook[s]" do not allege a specific crime. Instead, they constitute expressions of opinion, which are not actionable."); see, e.g., Gast v. Brittain, 589 S.E.2d 63, 64 (Ga. 2003) ("[The defendant's] assertions regarding 'immorality' and the 'ideals of Scouting' are plainly the sorts of opinions that are incapable of being proved false."); see, e.g., Lucas, 659 S.E.2d at 616 ("If an opinion is based upon facts already disclosed in the communication, the expression of the opinion implies nothing other than the speaker's subjective interpretation of the

facts.'" (quoting Jaillett v. Ga. Television Co., 520 S.E.2d 721, 726 (Ga. Ct. App. 1999))).

Ms. Townsend argues that her statements discussing and extrapolating details from the Walters Letter (Statements 21, 52, 53, 54, 55) are not defamatory because they express her opinion as an investigator and journalist. [Dkt. 7-1, at 22–23]. Ms. Townsend argues that she properly signals to listeners that Statements 21, 52, 53, 54, and 55 are merely her opinion, including through her use of disclaimers stating that the letter might be a hoax, and indicating that Ms. Townsend was not sure if the letter was real or not. [See generally Dkt. 19]. Mr. Farmer argues that the statements are not protected opinion because statements based on the accusations in the Walters Letter as to Mr. Farmer's purported crimes are capable of being proven true or false, which means they cannot be pure statements of opinion under Georgia law. [Dkt. 15, at 24–27].

Where "a defendant offers specific statements capable of being proved false in explanation for a negative opinion about a plaintiff's professional abilities, that statement can be the ground for a defamation claim. The 'explanation ... must have been truthful to avoid potential liability for [defamation].'" N. Atlanta Golf Operations, LLC v. Ward, 870 S.E.2d 814, 819 (Ga. Ct. App. 2022) (quoting Elder v. Cardoso, 421 S.E.2d 753,

60

755 (Ga. Ct. App. 1992)). Therefore, at this stage, the Court is not willing to dismiss Ms. Townsend's statements as non-actionable opinion. While her statements might express her opinion as to how details in the Walters Letter relate to other aspects of Ms. Nix's case and include disclaimers to that effect, these opinions are based on statements from the Walters Letter which are capable of being true or false. Accusations that Mr. Farmer murdered, kidnapped, and sexually assaulted Ms. Nix must necessarily be either true or false. Therefore, Ms. Townsend's statements opining upon details from the Walters Letter are not pure opinion nor exempt from defamation liability on that basis.

Further, the Court will not separate the five "opinion" statements identified by Ms. Townsend from the rest of the allegedly defamatory statements. Even if the five statements were found not to be defamatory individually, the statements still comprise the "context" of the publication and must be considered as such to ascertain the defamatory nature of the other allegedly defamatory statements. See Lucas, 289 S.E.2d at 615 ("A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily

61

understand it." (quoting Constitution Pub. Co. v. Andrews, 177 S.E. 258, 259 (Ga. Ct. App. 1934))).

The Court now turns to whether Ms. Towsend's statements are defamatory based on Georgia's two-step inquiry.

### c. Conditional Privilege

The second element required to state a Georgia defamation claim is that the defamatory statements constitute an "unprivileged communication to a third party." Id. Georgia recognizes both absolute and conditional privileges—an absolutely privileged statement "cannot form the basis for a defamation claim," but a conditional privilege imposes a higher level of fault than ordinary negligence that the plaintiff must prove. Oskouei v. Matthews, 912 S.E.2d 651, 659–60 (Ga. 2025).

Here, Ms. Townsend argues that her statements about Mr. Farmer are conditionally privileged under Georgia law. [Dkt. 7-1, at 26–28]. Specifically, she invokes O.C.G.A. § 51-5-7(4), which privileges "[s]tatements made in good faith as part of an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern, as defined in

62

subsection (c) of Code Section 9-11-11.1."[9] O.C.G.A. § 51-5-7(4). Code Section 9-11-11.1(c)(3) includes "[a]ny written or oral statement or writing or petition made in a place open to the public or a public forum in connection with an issue of public interest or concern."

Ms. Townsend argues that this "public interest" conditional privilege applies to her statements because the Nix Episodes discuss the circumstances surrounding an unsolved murder, which is an issue of public concern. [Dkt. 7-1, at 26–28]. Mr. Farmer argues that the murder is not subject to the conditional privilege because the statements were not made in good faith and were made with malice towards Mr. Farmer. [Dkt. 15, at 27–32].

The Georgia Supreme Court recently clarified Georgia's law on conditional privileges in Oskouei v. Matthews, 912 S.E.2d 651 (Ga. 2025). The defendant must make a prima facie showing that "an allegedly defamatory statement is conditionally privileged," by first "establish[ing] that the allegedly defamatory

_____

[9] Ms. Townsend also invokes conditional privilege under O.C.G.A. § 51-5-7(3), which protects "[s]tatements made with a good faith intent on the part of the speaker to protect his or her interest in a matter in which it is concerned," and § 51-5-7(9), which protects "[c]omments upon the acts of public men or public women in their public capacity and with reference thereto." O.C.G.A. § 51-5-7(3), (9). [Dkt. 7-1, at 26–28]. However, since no qualifying interests of Ms. Townsend's are at issue here, nor do the defamatory statements relate to acts of public figures in their public capacity, neither sub-section applies.

statement falls within a category of communications listed in OCGA § 51-5-7" and then showing "'good faith, an interest to be upheld, a statement properly limited in its scope, a proper occasion, and publication to proper persons.'" Oskouei, 912 S.E.2d at 659–60. After the defendant makes the required prima facie showing, the burden shifts to the plaintiff. Id.

Here, Ms. Townsend has met her burden of establishing that her statements fall within a category of communications listed in O.C.G.A. § 51-5-7—namely, the public interest privilege. Discussion about an unsolved murder is a matter of public interest, regardless of whether the murder was or is currently "hot news." See Cox Broad. Corp. v. Cohn, 95 S. Ct. 1029, 1045 (1975) ("The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions, however, are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government.").

After the defendant makes the required prima facie showing establishing the conditional privilege, the burden shifts to the plaintiff to "prov[e] that 'the privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted.'" Id. at 659 (quoting O.C.G.A. § 51-5-9).

64

Statements are made with private malice when they are made "with ill will towards the plaintiff or with an intent to injure him."[10] Oskouei, 912 S.E.2d at 671; see, e.g., Potts v. Richardson, 918 S.E.2d 146, 152 (2025) ("Hence, in the absence of evidence that [defendant] made his statements with ill will or with intent to injure [plaintiff], the trial court did not err in its determination that [plaintiff] failed to demonstrate that the privilege was used merely as a cloak for venting private malice."); see, e.g., Savannah Bank & Tr. Co. v. Sumner, 329 S.E.2d 910, 913 (1985) (holding that when a communication is conditionally privileged, "the burden is on the plaintiff to show actual malice, and he may do so by introducing in evidence extraneous circumstances which show an actual spite, ill will or desire to injure the person defamed"); see, e.g., Williams v. Cook, 386 S.E.2d 665, 666–67 (Ga. Ct. App. 1989) (holding that appellant failed to show private malice under O.C.G.A. § 51-5-9 in part because the record indicated that appellant's firing was a pure personnel decision and that appellant "was not singled out in a punitive

—————————————

[10] The court in Oskouei clarified that Georgia's common-law "private malice" standard applied in defamation cases is distinct from the Constitutional "actual malice" standard applied where the plaintiff is a public figure. See Oskouei, 912 S.E.2d at 660–72 (distinguishing "private malice" from the "actual malice" standard used in New York Times v. Sullivan, 84 S. Ct. 710 (1964) and overruling Georgia Court of Appeals cases which apply the "actual malice" or "reckless disregard" standard to private plaintiffs seeking to overcome a defendant's conditional privilege).

manner"); see, e.g., Dominy v. Shumpert, 510 S.E.2d 81, 86 (Ga. Ct. App. 1998) (holding that the plaintiff failed to show malice "involving intent of mind and heart, or ill will against a person" sufficient to overcome a conditional privilege where the defendant testified that she was "motivated solely out of a sense of duty and concern for patient safety" and "bore no animus against plaintiff," and the plaintiff "testified at his deposition that he knows of no reason why [the defendant] would bear him ill will").

   "Generally both the question of whether the communication was privileged and whether it was uttered maliciously are jury questions." O'Neal v. Home Town Bank of Villa Rica, 514 S.E.2d 669, 678 (Ga. Ct. App. 1999) (quoting Cohen v. Hartlage, 348 S.E.2d 331, 333 (Ga. Ct. App. 1986)); see McIntosh v. Williams, 128 S.E. 672, 673 (Ga. 1925): (determining that questions regarding whether plaintiff had "used [the privilege] as a cloak for venting private malice" were jury questions); see DeLoach v. Maurer, 204 S.E.2d 776, 779 (Ga. Ct. App. 1974) (determining that the applicability of conditional privilege is a jury question). Previously, Georgia courts treated the "actual malice" or "reckless disregard" standard as a question of law for the courts to determine; however, the private malice standard looks to the defendant's ill will towards the plaintiff, and generally, a question of one's intent is a question of fact reserved for the jury.

66

Mr. Farmer alleges in his complaint that Ms. Townsend published her statements with actual malice [Dkt. 1, at ¶¶ 96–104], as well as malice towards Mr. Farmer specifically, "by referencing Farmer's recently deceased wife, coupled with her fabrication that the Phony Letter stated Farmer liked blondes." [Dkt. 1, at ¶ 105]. Mr. Farmer's allegation of Ms. Townsend's malice towards him is sufficient to survive the motion to dismiss on this issue. Therefore, the Court will not dismiss Mr. Farmer's claim on the basis of privilege at this stage.

### d. Fault by the Defendant and Special Harm

The final two elements, "fault by the defendant" and "special harm" are sufficiently pleaded by Mr. Farmer. Fault by the defendant is normally judged by the standard of ordinary negligence, unless a conditional privilege applies to the statements or the plaintiff is a public figure. Zeh, 864 S.E.2d at 428. Here, neither party argues that Mr. Farmer was a public figure, and as discussed above, the conditional privilege does not apply at this stage. Mr. Farmer alleges that Ms. Townsend published her statements with actual knowledge and reckless disregard for their potential falsity, which satisfies the negligence standard. [Dkt. 1, at ¶¶ 96–105].

If a statement falls under one of Georgia's per se defamation categories, then harm is inferred, and the plaintiff need not plead special harm. O.C.G.A. § 51-5-

67

4(b). Mr. Farmer alleges that the defamatory statements fall under O.C.G.A. § 51-5-4(a)(1) for "[i]mputing to another a crime punishable by law."

Since Ms. Townsend's statements impute the commission of the crime of murder, sexual assault, and kidnapping, among other crimes, to Mr. Farmer, Ms. Farmer has met his burden of showing that the statements constitute per se defamation. See Cottrell, 788 S.E.2d at 781 ("In regard to imputing a crime, '[t]o constitute slander per se, ... the words at issue must charge the commission of a specific crime punishable by law. Where the plain import of the words spoken impute no criminal offense, they cannot have their meaning enlarged by innuendo.'" (quoting Dagel v. Lemcke, 537 S.E.2d 694, 696 (Ga. Ct. App. 2000))).

Therefore, Mr. Farmer has sufficiently pleaded all required elements for a defamation claim under Georgia law, and Ms. Townsend's Motion to Dismiss for Failure to State a Claim pursuant to Rule 12(b)(6) [Dkt. 7] is **DENIED**.

### CONCLUSION

For the foregoing reasons, Ms. Townsend's Motion to Dismiss for Lack of Personal Jurisdiction (Rule 12(b)(2)) and Failure to State a Claim (Rule 12(b)(6)) [Dkt. 7] is **DENIED**. Mr. Farmer's Motion for Discovery Regarding Jurisdiction [Dkt. 16] is **DENIED**. Accordingly, the Court's previous stay of proceedings in this case [Dkt. 14] is lifted.

**SO ORDERED** this 24th day of February, 2026.

_____

**RICHARD W. STORY**
United States District Judge